# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **TRAVIS D. GILLIAM,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:16cv00009 |
| | ) | |
| **NANCY A. BERRYHILL,**[1] | ) | **MEMORANDUM OPINION** |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | |
| Defendant | ) | BY: PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

## I. Background and Standard of Review

Plaintiff, Travis D. Gilliam, ("Gilliam"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011 & West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Berryhill is substituted for Carolyn W. Colvin, the previous Acting Commissioner of Social Security.

reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4ᵗʰ Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4ᵗʰ Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "'substantial evidence.'"'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4ᵗʰ Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Gilliam protectively filed applications for DIB and SSI on December 19, 2011, alleging disability as of September 3, 2009, due to adult attention deficit hyperactivity disorder, ("ADHD"); knee problems; bipolar disorder; manic depression; aggression disorder; back pain; insomnia; extreme anxiety; grief issues; and fatigue. (Record, ("R."), at 124-27, 139, 143, 149, 151, 813-21.) The claims were denied initially and on reconsideration. (R. at 72-74, 81-82, 83-85.) Gilliam then requested a hearing before an administrative law judge, ("ALJ"). (R. at 86.) A hearing was held by video conferencing on February 2, 2015, at which Gilliam was represented by counsel. (R. at 848-87.)

By decision dated March 19, 2015, the ALJ denied Gilliam's claims. (R. at 18-29.) The ALJ found that Gilliam met the nondisability insured status requirements of the Act for DIB purposes through March 31, 2017.[2] (R. at 20.) The ALJ also found that Duty had not engaged in substantial gainful activity since September 3, 2009, the alleged onset date. (R. at 20.) The ALJ found that the medical evidence established that Gilliam suffered from a combination of severe

---

[2] Therefore, Gilliam must show that he was disabled between September 3, 2009, the alleged onset date, and March 19, 2015, the date of the ALJ's decision, in order to be eligible for DIB benefits.

impairments, namely history of personality disorder; major depressive disorder; anxiety-related disorder; history of substance use disorder; Hepatitis C; and degenerative joint disease of the knees status-post surgeries, but he found that Gilliam did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 21-23.) The ALJ also found that Gilliam had the residual functional capacity to perform simple, easy-to-learn, unskilled light work[3] that did not require more than occasional operation of foot controls with the lower extremities; balancing; kneeling; crouching; stooping/bending; climbing of ramps and stairs; or interaction with supervisors, co-workers and the public; and which did not require crawling; climbing of ladders, ropes or scaffolds; exposure to hazards; or handling food or beverages. (R. at 23.) The ALJ also found that Gilliam needed a static work environment with few changes in work routines and settings. (R. at 23.) Thus, the ALJ found that Gilliam was unable to perform any past relevant work. (R. at 27.) Based on Gilliam's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that there were other jobs available that Gilliam could perform, including a packing line worker, a garment folder, a weight tester, a cuff folder and an assembler. (R. at 27-28.) Therefore, the ALJ found that Gilliam was not under a disability as defined under the Act and was not eligible for benefits. (R. at 29.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2016).

After the ALJ issued his decision, Gilliam pursued his administrative appeals, (R. at 11-13), but the Appeals Council denied his request for review of the ALJ's decision. (R. at 6-10.) He then filed this action seeking review of the ALJ's

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2016).

unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2016). The case is before this court on Gilliam's motion for summary judgment filed October 27, 2016, and on the Commissioner's motion for summary judgment filed December 1, 2016.

## *II. Facts*

Gilliam was born in 1977, (R. at 124), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). He obtained his general equivalency development, ("GED"), diploma and has vocational training in welding. (R. at 144, 872-74.) He has past relevant work as a welder. (R. at 144, 854-55.)

At his hearing, Gilliam testified that he was laid off from his job as a welder in September 2009, was last self-employed in lawn care in 2010 and last worked as a welder in 2014. (R. at 854-55.) He testified that he received unemployment compensation for less than a year after being laid off. (R. at 855-56.) Gilliam stated that he could not return to welding because it is too hard on his knees, on which he had undergone two surgeries on the left and had a torn meniscus on the right. (R. at 860.) He noted continued left knee problems, including locking up, ankle cramping and pain shooting into his back, but was not seeing a doctor for this because he could not afford treatment. (R. at 861.) Gilliam also testified that his "nerves" prevented him from going outside very much because he did not like to be around people. (R. at 863.) He reported difficulty focusing and crying at times. (R. at 864.) Gilliam stated that he had seen a counselor in the past, but had not done so in a long time because he could no longer afford treatment. (R. at 863.) He testified that he had abused drugs in the past, but had been clean since 2013 or 2014. (R. at 864-65.) He stated that over an eight- to 12-month period, his mother and grandmother

died, and he lost his wife, his son and his house. (R. at 867.) Gilliam also testified that he suffered from Hepatitis C, which caused him much concern, but for which he was not receiving treatment. (R. at 869-71.)

Gilliam testified that he watched television and read some during the day, noting that it "soothe[d]" him. (R. at 875.) He testified that, after his mother's death, he began living with her best friend, who took care of everything around the house, except he kept his room clean. (R. at 876.)

Vocational expert, Asheley Wells, also testified at Gilliam's hearing. (R. at 878-85.) Wells classified Gilliam's work as a welder as medium[4] and skilled. (R. at 880.) When asked to consider a hypothetical individual of Gilliam's age, education and work experience, who was limited to simple, easy-to-learn, repetitive medium work that did not require more than occasional climbing of ramps, stairs, ladders, ropes and scaffolds, kneeling, crouching and crawling; that did not require more than frequent balancing and stooping; that required no more than occasional exposure to hazards, such as dangerous moving machinery and unprotected heights; and that did not require more than occasional interaction with the public, supervisors and co-workers, Wells testified that such an individual could not perform Gilliam's past work as a welder, but could perform jobs existing in significant numbers in the national economy, including those of a hand packager, a dishwasher and a hospital cleaner. (R. at 880-81.) Wells next was asked to consider the same hypothetical individual, but who was limited to the performance of simple, easy-to-learn, repetitive unskilled light work that did not require pushing or pulling with the lower extremities, such as the operation of foot controls; that

---

[4] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2016).

required no more than occasional balancing and stooping/bending; that required no exposure to hazards, such as dangerous moving machinery and unprotected heights; and that required no handling of food or beverages. (R. at 882.) This individual also would require a static work environment with few changes in work routines and settings. (R. at 882-83.) All the other limitations included in the first hypothetical remained the same. (R. at 882.) Wells testified that such an individual could perform jobs existing in significant numbers in the national economy, including those of an assembler, a packing line worker and a garment folder. (R. at 883.) When Wells was asked to consider the same hypothetical individual, but who could perform sedentary[5] work that did not require standing or walking more than two hours in an eight-hour workday, he testified that such an individual could perform jobs existing in significant numbers in the national economy, including those of a weight tester, a cuff folder and an assembler. (R. at 883-84.) Wells testified that all the aforementioned jobs permitted no more than one monthly absence and that an individual must be on task for at least 90 percent of the day to be employable. (R. at 884.) Lastly, when Wells was asked to consider a hypothetical individual with the limitations set out in psychologist Lanthorn's January 2015 mental assessment of Gilliam, he testified that such an individual could not perform any jobs. (R. at 884-85.)

In rendering his decision, the ALJ reviewed medical records from Norton Community Hospital; Stone Mountain Health Services; Frontier Health; Indian Path Medical Center; Southwestern Virginia Mental Health Institute; Community Physicians; William D. Sims, M.Ed.; Dr. Kevin Blackwell, D.O.; Dr. Andrew

---

[5] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2016).

Bockner, M.D., a state agency physician; Dr. Donald Williams, M.D., a state agency physician; Louis Perrott, Ph.D., a state agency psychologist; Dr. William Rutherford, Jr., M.D., a state agency physician; The Laurels; Highlands Pathology Consultants; Dr. Uzma Ehtesham, M.D.; Johnston Memorial Hospital; Bristol Regional Medical Center; Mountain View Regional Medical Center; and B. Wayne Lanthorn, Ph.D.

Gilliam presented to Mountain View Regional Medical Center, ("Mountain View"), on August 30, 2009, with complaints of an abscessed tooth. (R. at 602-10.) When he refused Tylenol #3, instead requesting Lortab, Dr. Jack K. Cox, II, M.D., advised Gilliam he would need to follow up with his dentist to get a prescription. (R. at 604-05.) His behavior was appropriate, and he was alert and oriented. (R. at 605.) Gilliam presented to Norton Community Hospital, ("Norton Community"), on October 7, 2010, with a right shin laceration. (R. at 299-300, 648-55.) He was calm with no homicidal or suicidal ideations. (R. at 649.) Gilliam received stitches and Keflex. (R. at 198, 653-54.)

Gilliam was seen at the William A. Davis Clinic at Stone Mountain Health Services, ("Stone Mountain"), on August 23, 2011, with complaints of "nerves," anxiety, depression and sleep difficulties. (R. at 206-08.) He reported chronic anxiety and depression since childhood, worsened by being unemployed. (R. at 206.) He denied suicidal or homicidal ideations, but admitted getting Xanax and Subutex off the street. (R. at 206.) Gilliam reported that he had just begun weekly psychological counseling. (R. at 206.) His mood was anxious and depressed, but he spoke calmly and was not tearful, and he was fully oriented with normal memory, judgment and insight. (R. at 207.) Gilliam was diagnosed with anxiety and depression, for which he was prescribed Vistaril and Celexa. (R. at 208.) On September 28, 2011, Gilliam presented with complaints of being "really nervous"

and having an agitated anxiety. (R. at 203-05.) He requested Ativan, Valium or Klonopin for his anxiety, noting that he did not want Xanax due to past abuse issues. (R. at 205.) Given his history of drug abuse, the doctor was not comfortable prescribing any benzodiazepines, and Gilliam left the appointment. (R. at 205.) When he returned on November 22, 2011, he complained of right knee pain with bending, and he requested to see a psychiatrist for anxiety. (R. at 200-02.) He was diagnosed with hand pain, knee pain and a general anxiety disorder, and he was referred to an orthopaedist. (R. at 202.)

Gilliam continued to receive treatment at Stone Mountain and Frontier Health through December 2011 for depression and anger issues. (R. at 462-70, 473, 483-89, 548-49, 763-75.) On August 2, 2011, he reported that he was looking for employment and would like to reconcile with his wife from whom he had been separated for six years. (R. at 773.) He stated that Xanax had helped him in the past, and he admitted taking Suboxone and Xanax illegally for the previous two years for his nerves. (R. at 773-74.) He denied suicidal ideations, but noted homicidal thoughts when he got really angry. (R. at 774.) Gilliam could not pinpoint any triggers for his anger. (R. at 774.) He was depressed, withdrawn and agitated with impaired impulse control and sleep disturbance. (R. at 774.) Gilliam was diagnosed with drug dependence; sedative, hypnotic or anxiolytic dependence; and depressive disorder, not elsewhere classified; and his then-current GAF score was assessed at 50,[6] with his highest in the previous six months being 55[7] and his

---

[6] A GAF score of 41 to 50 indicates "[s]erious symptoms … OR any serious impairment in social, occupational, or school functioning. …" DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).

[7] A GAF score of 51 to 60 indicates "[m]oderate symptoms … OR moderate difficulty in social, occupational, or school functioning. …" DSM-IV at 32.

lowest being 40.[8] (R. at 773.) He was referred to James Kegley for therapy and anger management. (R. at 774-75.) Gilliam saw Kegley on two occasions from August 9, 2011, through November 14, 2011. (R. at 220-22, 238, 462-69, 483-89, 535, 548, 761-71.) On August 9, 2011, he stated that he had been looking for employment since being laid off in September 2009. (R. at 474-75, 763.) Although he was separated from his wife, they were living together with their six-year-old son. (R. at 474, 763.) Gilliam had age-appropriate activities of daily living skills, but he endorsed moderate rage, social withdrawal, memory impairment, anger, depressed mood and insomnia; and he endorsed mild anxiety. (R. at 466-68, 767.) He denied suicidal ideation, but admitted to past homicidal thoughts against his wife and a man with whom she was unfaithful. (R. at 467.) He admitted using Xanax the previous day, and he reported going to the Laurels two or three years previously, which was unsuccessful. (R. at 220.) Gilliam reported no major health problems and no psychiatric hospitalizations. (R. at 485-86.) Kegley scheduled Gilliam for individual and group counseling. (R. at 767.)

In a DSM-IV Assessment form, completed on August 16, 2011, Gilliam was diagnosed with an impulse control disorder; depressive disorder; opioid dependence; and sedative, hypnotic or anxiolytic dependence; and his then-current GAF score was assessed at 50. (R. at 761-62.) He failed to show for appointments on August 23, October 5, October 24, and November 3, 2011. (R. at 242, 247, 541, 544, 547.) On November 14, 2011, Gilliam had his first counseling session with Kegley, at which time he complained of relationship issues with his wife and stated he wanted a job. (R. at 238, 535.) He reported that he had "beat" his pain medication addiction and had been clean for two months. (R. at 238, 535.) He

---

[8]A GAF score of 31 to 40 indicates "[s]ome impairment in reality testing or communication … OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. …" DSM-IV at 32.

reported staying nervous and having no motivation and stated that he had to "fix [his] mind" before he could return to the workforce. (R. at 238, 535.) He stated that he was "fine" when he was on his medications and had requested Xanax from Stone Mountain, but they had prescribed him other mood medications. (R. at 238, 535.) He displayed no indication of suicidal or homicidal ideations, and his mood was mildly depressed with congruent affect. (R. at 238, 535.) Gilliam did not keep his appointments on December 5, December 13 or December 20, 2011. (R. at 233-37, 530-34.)

Dr. Uzma Ehtesham, M.D., a psychiatrist, completed a mental assessment of Gilliam on January 19, 2012, finding that he had a seriously limited ability to follow work rules; to relate to co-workers; to deal with the public; to use judgment; to interact with supervisors; to deal with work stresses; to function independently; to understand, remember and carry out simple, detailed and complex job instructions; to maintain personal appearance; to behave in an emotionally stable manner; and to relate predictably in social situations. (R. at 723-25.) She found that Gilliam had no useful ability to maintain attention and concentration. (R. at 723.) Although Dr. Ehtesham supported these findings with Gilliam's problems of depression of anxiety, she noted that she had not seen him since 2005. (R. at 723-24.) Dr. Ehtesham found that Gilliam could manage benefits in his own best interest, and she stated that she was unsure how frequently he would be absent from work due to his impairments or treatment. (R. at 725.)

Gilliam continued to receive services from Frontier Health through June 2012, but he continued to miss numerous appointments. He did not keep an appointment with Kegley on January 16, 2012, but on February 22, 2012, he expressed a desire for return services. (R. at 226-27, 229, 523-24, 526.) When Gilliam was seen for screening on March 5, 2012, he stated that he needed to find a

psychiatrist to be put back on Xanax. (R. at 225, 522, 757-60.) At that time, Gilliam's wife asked that Gilliam be admitted to Ridgeview, stating that he physically threatened her and his mother when he did not get the medication he wanted. (R. at 758.) She reported that Gilliam's mother gave him morphine, Lortab and Xanax, and arguments ensued when she refused to do so. (R. at 758.) Gilliam denied suicidal or homicidal ideations, as well as psychosis, but he admitted to continued use of Xanax and Suboxone "off the street" for his nerves. (R. at 225, 522, 759.) He did not wish to go to the Laurels, however, stating that there were more drugs there that "out here." (R. at 225, 522, 759.) It was determined that Gilliam did not meet the criteria for hospitalization. (R. at 759.) He was diagnosed with impulse control disorder, unspecified; depressive disorder, not elsewhere classified; and drug dependence; and his then-current GAF score was placed at 50. (R. at 759.) That same day, Gilliam advised Kegley that Xanax was the best medication for him, as Celexa made him more agitated. (R. at 225, 522.) Gilliam had a mildly depressed mood with congruent affect. (R. at 225, 522.) Kegley provided contact information for Dr. Ehtesham, a psychiatrist, and Dr. Balluyot for a Suboxone program. (R. at 225, 522.) Following this session, Gilliam's wife advised Kegley that their seven-year-old son had been taken from them by the Department of Social Services, ("DSS"), due to Gilliam's drug use. (R. at 224, 521.) However, when Kegley suggested treatment at the Laurels, Gilliam's wife requested admission to Ridgeview. (R. at 224, 521.) She claimed that they could not afford for Gilliam to see Dr. Ehtesham and did not desire outpatient substance abuse treatment. (R. at 224, 521.)

A March 15, 2012, DSM-IV Assessment indicated that Gilliam suffered from a depressive disorder; opioid dependence; sedative, hypnotic or anxiolytic dependence; and impulse control disorder. (R. at 218-219.) His then-current GAF score was assessed at 50. (R. at 218.) Gilliam again reported doing odd jobs and

that he was actively pursuing employment on his own. (R. at 476-77.) He reported no major health problems, he had age-appropriate activities of daily living skills, and he stated that he enjoyed woodworking for diversion. (R. at 478.) Gilliam reported depression and anger issues with which he needed help. (R. at 479.) Although Gilliam had been evaluated for psychiatric hospitalizations in the past, no referrals had been made. (R. at 479.) He reported no suicidal or homicidal symptoms which would require commitment. (R. at 479.) Gilliam's possible significant substance abuse issues were noted, as was his refusal to accept residential referrals to address this. (R. at 480.) Case management and outpatient therapy services were recommended. (R. at 481-82.) Gilliam again stated that he needed a job for his life to improve. (R. at 482.)

When Gilliam did not show up for his March 21, 2012, appointment with Kegley, he was discharged from outpatient mental health therapy. (R. at 210-13, 512-16.) In a Discharge Summary from that same day, Gilliam's erratic attendance and refusals to participate in residential substance abuse treatment were noted. (R. at 459.) Gilliam did not show up for his outpatient substance abuse treatment appointment on April 4, 2012, and the following day, he was evaluated pursuant to an emergency custody order issued after making verbal threats and stealing some of his mother's Xanax. (R. at 456-58, 509, 750-56.) He denied stealing the Xanax, but advised he became upset with his wife and spit in her face after discovering her with another man. (R. at 751.) He reported using Xanax and Suboxone and having depression with nightly crying spells for the previous five months. (R. at 751.) He also reported short-term memory problems, but denied auditory or visual hallucinations, as well as suicidal or homicidal ideations. (R. at 751.) On mental status examination, Gilliam had a normal appearance, behavior, orientation, thought content, sensation, insight and judgment, his mood was depressed with a flat affect, and he exhibited impaired concentration and decreased appetite and

sleep maintenance. (R. at 753.) His intellectual functioning was deemed average. (R. at 753.) Gilliam was diagnosed with depressive disorder, not elsewhere classified; drug dependence; sedative, hypnotic or anxiolytic dependence; and impulse control disorder, unspecified; and his then-current GAF score was assessed at 45. (R. at 754.) He declined a referral, and no involuntary action was taken. (R. at 755.) He was released home and refused outpatient counseling. (R. at 756.)

On April 6, 2012, Gilliam's wife stated that he had been threatening to hurt himself and others, that she had an emergency protective order against him and that he had stolen his mother's medications. (R. at 507.) On April 13, 2012, Gilliam's wife advised that he was in jail and that he had been injecting bath salts and using his mother's benzodiazepines. (R. at 506.) On May 15, 2012, Gilliam was encouraged to call and schedule an appointment. (R. at 501-02.) On May 30, 2012, B. Palmer, LPN, saw Gilliam for substance abuse case management, at which time he reported having been incarcerated for misuse of a vehicle and that he and his wife were divorcing. (R. at 500.) He was fully oriented, he denied suicidal or homicidal ideations, his thought processes were intact, and he was coherent and logical. (R. at 500.) He requested something for his nerves, noting that he had been off of all medications for 43 days. (R. at 500.) Gilliam stated that he was not interested in addiction treatment or attending group counseling, and he planned to seek out a doctor who would prescribe nerve medication. (R. at 500.) He asked that his case be closed. (R. at 500.) A June 12, 2012, Substance Abuse History form indicated that Gilliam last used Oxycodone and Xanax on April 23, 2012, and that he smoked a pack of cigarettes daily. (R. at 454.) In a Discharge Summary, also dated June 12, 2012, it was noted that Gilliam was being treated based on his opiate and benzodiazepine dependence, but had made limited progress toward recovery. (R. at 453.) Gilliam admitted he did not want to quit taking pain

pills or Xanax. (R. at 453.)

Gilliam presented to Norton Community in June 2012, with complaints of bilateral lower extremity swelling, pain and cellulitis. (R. at 249, 252.) However, he left against medical advice, upon learning that his mother had passed away. (R. at 249, 252.) He returned on June 19, 2012, with continued complaints of bilateral lower extremity swelling, redness and pain, as well as chest pain and shortness of breath. (R. at 252, 287-89, 301-19.) He was transferred to Indian Path Medical Center, ("Indian Path"), for evaluation of possible endocarditis. (R. at 249, 289.) A bilateral venous duplex ultrasound of the lower extremities showed no evidence of deep venous thrombosis, and an abdominal CT scan was normal except for some bibasilar atelectasis. (R. at 260, 328-29.) Track marks were noted on the left antecubital fossa. (R. at 249.) Gilliam denied anxiety, depression and memory problems at that time, and he was alert and fully oriented, following commands and acting appropriately with a normal mood and affect. (R. at 253, 261.) A transesophageal echocardiogram, ("TEE"), was essentially normal, showing no evidence of endocarditis, and a chest x-ray showed discoid atelectasis or scarring in the right lung base. (R. at 251, 259.) Gilliam tested positive for Hepatitis C, for which he was advised to follow up with a doctor. (R. at 249.) He was diagnosed with lower extremity cellulitis; lower extremity edema of questionable etiology, possibly due to cirrhosis; Hepatitis C; and history of intravenous drug abuse, and he was advised to keep his legs elevated. (R. at 249.)

On July 12, 2012, a temporary detention order was issued for Gilliam based on suicidal threats with a knife, and he was transferred to Lonesome Pine by the Wise County Sheriff's Office. (R. at 437-43, 733-40.) He reported several personal stressors, including his mother's death the previous month, his wife leaving him for another man, his children being in DSS custody and a recent Hepatitis C

diagnosis. (R. at 438, 440.) On mental status examination, Gilliam was unkempt and tearful, he exhibited psychomotor retardation and soft and slowed speech, he had a depressed mood with a flat affect, and he had little insight and impaired judgment. (R. at 440.) However, he was oriented with normal thought content, thought processes, sensation, memory and appetite. (R. at 440.) His estimated intellectual functioning was average. (R. at 440.) He appeared to be very depressed with recent increased decompensation, stating "I've thrown my life away on dope." (R. at 440.) His coping abilities were impaired by substance abuse and significant losses, and he was unable to affirm his ability to avoid self-harm. (R. at 440.) Gilliam was diagnosed with sedative, hypnotic or anxiolytic dependence, unspecified; opioid-type dependence, unspecified; and depressive disorder, not elsewhere classified; and his GAF score was assessed at 35. (R. at 441.) Because it was concluded that there was a substantial likelihood that, as a result of mental illness, he would, in the near future, cause serious physical harm to himself, he was sent to Southwestern Virginia Mental Health Institute, ("Marion"), on a temporary detention order. (R. at 443.)

Upon admission at Marion, Gilliam appeared his stated age and had good hygiene, he was in no acute distress, he was fully oriented and alert, calm and cooperative, but tearful, with clear cognition and no odd mannerisms, and he made good eye contact. (R. at 268-69, 276.) He had a severely depressed mood with appropriate, but sad, affect, and he had suicidal ideation and intent and homicidal ideation. (R. at 269.) His affect was appropriate, but sad. (R. at 269, 276.) He stated "I'm severely depressed with thoughts of killing myself with a knife." (R. at 275.) Gilliam reported seeing occasional shadows. (R. at 269, 275.) His speech and language was age-appropriate, recent and remote memory was intact, insight was limited, judgment was poor, and he had average intelligence. (R. at 270, 276.) Gilliam was deemed to be at severe risk of deliberate self-harm, including suicide,

at moderate risk of intentional violence or threat to others and at mild risk of unintentional self-harm and unintentional violence or threat to others. (R. at 270.) He was diagnosed with depressive disorder, not otherwise specified, and polysubstance abuse/dependence, and his then-current GAF score was assessed at 30.[9] (R. at 277.) Gilliam's prognosis was deemed fair. (R. at 277.) He had no physical complaints, and he exhibited full range of motion with full and equal strength, bilaterally, and a normal gait and station. (R. at 273.) Mild edema of the feet was noted, likely due to Hepatitis C. (R. at 273-74.)

When Gilliam was discharged from Marion on July 24, 2012, his diagnoses remained unchanged, but his GAF score had increased to 50. (R. at 265-67.) He was alert and cooperative with no signs of depression, psychosis or odd mannerisms, his mood was euthymic with appropriate affect, he had no suicidal or homicidal ideation, and he had appropriate thought content with no loose associations, no delusions, paranoia or hallucinations. (R. at 265-66.) His cognition was clear, his memory was good for immediate, recent and remote events, and his insight and judgment were good. (R. at 266.) Although Gilliam was advised to follow up with a local community services board and medical practitioner, he failed to show up for an intake appointment at Frontier Health on July 31, 2012, as well as for an appointment with Joyce Thompson, FNP, for a psychological evaluation on August 2, 2012. (R. at 267, 496-98.)

Gilliam presented to Norton Community on November 19, 2012, after a dirt bike accident injured his left ribs and the fourth digit on the right hand. (R. at 286.) He had left chest tenderness to palpation, tenderness to palpation of the fourth digit

---

[9] A GAF score of 21 to 30 indicates that the individual's "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment … OR inability to function in almost all areas. …" DSM-IV at 32.

on the right and left knee pain. (R. at 286.) Gilliam was diagnosed with anxiety, Hepatitis C, left rib pain and right hand pain, and he was advised to take over-the-counter ibuprofen. (R. at 286.)

Gilliam returned to the emergency department at Lonesome Pine on November 25, 2012, with complaints of a toothache. (R. at 726-31.) His mental status was within normal limits, but he had chronic and severe upper dental caries. (R. at 727.) Gilliam was diagnosed with dental abscess, dental caries and cervical lymphadenopathy, and he was advised to follow up with a dentist as soon as possible. (R. at 728-30.)

William D. Sims, M.Ed., a licensed senior psychological examiner, conducted a psychological evaluation of Gilliam at the request of Disability Determination Services on January 22, 2013. (R. at 290-94.) Gilliam's mood was depressed with a flat affect, and he reported that he could not work because his knees were "shot" and he could not mentally cope with a job at that time. (R. at 290.) He reported his Hepatitis C diagnosis and stated he had a lot of muscle loss and weakness. (R. at 290.) His hospitalization at Marion in July 2012 was noted, as was his history of suicidal thoughts. (R. at 291.) He admitted using Klonopin or Xanax "off the street," which he last took the previous day, and he stated that he last consumed alcohol in 2002. (R. at 291.) He advised that he had used opiates, Suboxone, marijuana, morphine, Lortab and Percocet, some of which he used intravenously. (R. at 291.) Gilliam reported that he smoked one pack of cigarettes daily, and he had received alcohol and drug treatment at the Laurels. (R. at 291.) Gilliam stated that he was in the process of divorcing his wife and was living with a family friend named Lola. (R. at 291.) He reported the deaths of his mother, father and grandmother, with all of whom he was close. (R. at 291.) He reported that he had no close friends, and his interests included watching the History

Channel on television. (R. at 291.) He went to the ninth grade in school, but made poor grades and was suspended for fighting and truancy. (R. at 291.) He did not receive special education services, although he repeated Kindergarten. (R. at 291.) Gilliam reported that he was able to get along with supervisors and colleagues. (R. at 291.)

On mental status examination, Gilliam was fully oriented, he completed Serial 3 testing with one error, he spelled "world" forward and backward, he could recall three words after five minutes, and he maintained an adequate stream of conversation. (R. at 292.) He reported vague visual hallucinations of seeing something out of the corners of his eyes, but denied auditory hallucinations. (R. at 292.) His then-current level of intellectual functioning was deemed to be in the low average range. (R. at 292.) Gilliam reported isolation, decreased concentration, feelings of guilt, decreased energy, nightmares, decreased sleep, crying spells, decreased appetite and panic-like symptoms when he left his home. (R. at 292.) He denied irritability or physical aggression toward others, as well as then-current suicidal or homicidal ideation, plan or intent or any history of suicide attempts. (R. at 292.) Gilliam reported difficulty falling asleep and staying asleep. (R. at 292.) He reported that he was able to mow the lawn, pay bills, use the microwave, make sandwiches, do laundry, wash dishes, make his bed, take care of his personal needs and remember appointments. (R. at 292.) He reported offering to help Lola cook, but she would not let him. (R. at 292.) Gilliam reported attending church sometimes, and he stated he was able to shop, but it made him feel nervous and paranoid. (R. at 292.) He described a typical day as sometimes going places with Lola or sitting around the house and watching television. (R. at 292.) Gilliam behaved in an acceptable manner when engaged in activities, and he performed activities effectively. (R. at 292.)

Sims diagnosed Gilliam with major depressive disorder, recurrent, moderate; anxiety disorder, not otherwise specified; and sedative/anxiolytic abuse; and he placed his then-current GAF score at 50. (R. at 293.) He found that Gilliam could make adequate judgments about managing his funds and that he appeared to get along adequately with others. (R. at 293.) Sims concluded that Gilliam had a moderate limitation in his ability to understand and remember, but would be able to remember a work location and work schedule, and a moderate limitation in his ability to sustain concentration and persistence and to interact with others. (R. at 293.) Sims found that Gilliam was mildly limited in his ability to adjust to change and its requirements, but would be able to travel unaccompanied to unfamiliar locations and be aware of normal hazards and take appropriate precautions. (R. at 293.)

On January 25, 2013, x-rays of Gilliam's knees showed no abnormality, but a likely nonossifying fibroma or fibrous cortical defect. (R. at 296-98.)

Dr. Kevin Blackwell, D.O., completed a consultative examination of Gilliam on February 12, 2013, at the request of Disability Determination Services. (R. at 367-70.) Gilliam's chief complaints were knee problems and bipolar disorder. (R. at 367.) He noted that he had undergone two surgeries on his left knee after tearing all the ligaments. (R. at 367.) He reported that he was taking Xanax at that time. (R. at 367.) Gilliam was alert and fully oriented with good mental status, and affect, thought content and general fund of knowledge were intact. (R. at 368.) A physical examination was normal, including symmetrical and balanced gait, good and equal bilateral shoulder and iliac crest heights, no effusions or obvious deformities of the upper or lower joints, normal size, shape, symmetry and strength in all extremities, full and equal grip strength bilaterally, normal fine motor movement and skill activities of the hands, good and equal reflexes in all

extremities, negative Romberg test and intact proprioception. (R. at 368-69.) Blackwell diagnosed chronic bilateral knee pain and bipolar disorder by history, and he opined that Gilliam could sit for eight hours and stand for two hours in an eight-hour workday. (R. at 369.) He further opined that Gilliam could use both arms for overhead reaching one-third of the day, that he could use both feet for the operation of pedals one-third of the day, that he could not crouch, crawl or work at unprotected heights, that he must avoid repetitive and continuous stair climbing, that he could occasionally lift 40 pounds and frequently lift 25 pounds, that he should avoid squatting activities, that he could kneel one-third of the day and that he could use his hands for fine motor movement and skill activities. (R. at 370.) A Range of Motion Form, dated February 7, 2013, was within normal limits in all areas. (R. at 366.)

Dr. Andrew Bockner, M.D., a state agency physician, completed a Psychiatric Review Technique form, ("PRTF"), on March 4, 2013, in connection with Gilliam's initial disability claim. (R. at 41-42.) He opined that Gilliam was mildly restricted in his activities of daily living, experienced moderate difficulty in maintaining social functioning and in maintaining concentration, persistence or pace and had experienced one or two episodes of decompensation of extended duration. (R. at 41.) Dr. Bockner also completed a mental residual functional capacity assessment of Gilliam, finding that he had moderate limitations in his ability to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; and to

accept instructions and respond appropriately to criticism from supervisors. (R. at 46-47.) Dr. Bockner concluded that Gilliam would be able to meet the basic mental demands of competitive work on a sustained basis, as long as he had only limited interactions with the general public. (R. at 47.)

On March 5, 2013, Dr. Donald Williams, M.D., another state agency physician, completed a physical residual functional capacity assessment of Gilliam, finding that he could perform medium work with frequent balancing and stooping and occasional climbing of ramps, stairs, ladders, ropes and scaffolds, kneeling, crouching and crawling. (R. at 44-46.) He further found that Gilliam was limited in the use of his left hand for fine manipulation due to tendon damage to the left third and fifth digits. (R. at 45.) Dr. Williams also found that Gilliam should avoid concentrated exposure to hazards, such as machinery and heights. (R. at 45.) He concluded that Gilliam could adjust to other work. (R. at 49-50.)

Gilliam returned to Stone Mountain on April 29, 2013, with complaints of "nerves," difficulty sleeping, a fear of being around people, worrying a lot and staying nervous. (R. at 407-11, 417-21.) He reported experiencing two to three anxiety attacks monthly, but he denied depression, feeling hopeless and lack of motivation. (R. at 407, 417.) Gilliam's energy and concentration were good, but he reported having insomnia for five years. (R. at 407, 417.) He reported substance abuse in remission. (R. at 407, 417.) Gilliam had no symptoms of depression, suicidal thoughts or attempts, disturbing thoughts or feelings, difficulty focusing, hyperactivity, moodiness or obsessive thoughts or compulsions, and he had a normal gait, appropriate judgment and good insight and was fully oriented with intact recent and remote memory. (R. at 408, 418.) His mood was mildly anxious with appropriate affect. (R. at 408, 418.) Gilliam was diagnosed with nondependent tobacco use disorder; unspecified viral Hepatitis C without hepatic

coma; unspecified insomnia; opioid dependence in remission; and generalized anxiety disorder. (R. at 409, 419.) He was prescribed Lexapro and Vistaril, and he was advised to decrease his caffeine intake. (R. at 409, 419.)

On July 1, 2013, Gilliam saw Dr. Pema O. Bhutia, M.D., at Stone Mountain, reporting that Lexapro was not helping, but that Valium had been helpful in the past. (R. at 403-05.) Gilliam reported a fear of being around people, worrying and staying nervous a lot. (R. at 403.) He reported getting anxiety attacks two to three times monthly, but he denied depression, feeling hopeless and lack of motivation, and his energy and concentration were good. (R. at 403.) Gilliam denied suicidal or homicidal ideation, symptoms of depression, disturbing thoughts or feelings, difficulty focusing, hyperactivity, moodiness, obsessive thoughts or compulsions. (R. at 404.) On physical examination, he was alert and in no acute distress, with a normal gait, no gross neurological deficits, appropriate judgment, good insight, proper orientation and intact recent and remote memory. (R. at 405.) He had a mildly anxious mood with appropriate affect. (R. at 404.) His diagnoses remained unchanged, and he expressed that nothing would help him other than benzodiazepines. (R. at 404.) However, Dr. Bhutia did not believe this was an option given Gilliam's history of drug abuse. (R. at 404.) Gilliam declined a psychiatry referral due to a lack of insurance. (R. at 404.) A urine drug screen was positive for cannabinoids. (R. at 404.)

When Gilliam presented to the emergency department at Lonesome Pine on August 10, 2013, after burning his hand, his mental status was within normal limits. (R. at 371-400.) A physical examination also was within normal limits except for a single burn to the left hand. (R. at 372-73.) Gilliam had a full range of motion in all extremities. (R. at 373.) He received morphine and was given a prescription for naproxen and hydrocodone-acetaminophen. (R. at 373.)

On September 4, 2013, Ava Martin, PMHNP at Stone Mountain, saw Gilliam for complaints of anxiety and moodiness. (R. at 401-02, 406.) He denied depression, suicidal thoughts or attempts, disturbing thoughts or feelings, change in sleep pattern, difficulty focusing, hyperactivity, obsessive thoughts or compulsions. (R. at 401.) Gilliam had fair judgment and insight, as well as proper orientation and intact recent and remote memory. (R. at 401.) His mood was irritable with a congruent affect, and he had poor eye contact with soft and rapid speech. (R. at 401.) He denied any suicidal or homicidal ideations or auditory or visual hallucinations. (R. at 401.) Gilliam was described as "rude." (R. at 401.) He reported that he could not remember his past psychiatric history, including diagnoses. (R. at 401.) However, he remembered he previously had been prescribed Xanax, but reported that he had been off of his "nerve medication" for six years. (R. at 401.) Gilliam stated that he maintained his anxiety by buying Xanax off the street, noting that Buspar made him sick, and Vistaril "did nothing." (R. at 401.) He advised Martin that if he did not get a prescription for Xanax, it would be a waste of his time. (R. at 401.) When Martin suggested SSRIs as a first line treatment, Gilliam declined, stating "they don't work," and he left the session. (R. at 401.) Martin diagnosed Gilliam with nondependent tobacco use disorder; insomnia, unspecified; opioid-type dependence, in remission; depressive disorder, not elsewhere classified; anxiety state, unspecified; and unspecified personality disorder. (R. at 401.)

On September 26, 2013, Tracy S. Anderson, RN, QMPH with Frontier Health, completed another mental health screening of Gilliam at the request of his attorney. (R. at 741-43.) At that time, Gilliam reported that his anxiety was so bad, he never wanted to leave his home. (R. at 742.) He denied suicidal or homicidal ideations, as well as auditory or visual hallucinations. (R. at 742.) He also denied

substance abuse/dependence, noting that he had not used drugs since 2009, and he reported not taking any medication at that time. (R. at 742.) He reported bilateral knee pain and Hepatitis C, but did not have a medical doctor and no health insurance. (R. at 742.) A clinical assessment showed depression, anxiety and withdrawal. (R. at 742-43.) Anderson provisionally diagnosed depressive disorder, not elsewhere classified, and she placed Gilliam's GAF score at 60. (R. at 743.) In a DSM-IV Assessment, Gilliam was deemed to be of average or above intelligence. (R. at 471.) In a telephone call on February 6, 2014, Gilliam requested services due to some personal issues. (R. at 492.) He reported extreme anxiety, with an inability to sleep due to racing thoughts, as well as being withdrawn and an inability to go outside, which had rendered him unable to work for the previous two years. (R. at 492.) He denied suicidal or homicidal ideations or previous attempts, as well as psychosis. (R. at 492.) He stated he last used opiates in 2007 prior to an admission to the Laurels. (R. at 492.)

Gilliam attended another screening at Frontier Health with Amanda Dotson, M.A., on February 10, 2014. (R. at 430-33, 492.) At that time, he stated that his disability claim was based on his Hepatitis C diagnosis, and he denied any problems with depression. (R. at 431.) He did, however, state that he did not go outside and had not left his house in a couple of months. (R. at 431.) He denied suicidal or homicidal ideations, as well as auditory or visual hallucinations. (R. at 431.) Gilliam reported going three to four days without sleeping, racing thoughts, fear of dying and a lot of grief due to his mother's and grandmother's deaths. (R. at 431-32.) He was diagnosed with depressive disorder, not elsewhere classified; and opioid dependence, unspecified; and his GAF score was assessed at 60. (R. at 431.)

On February 27, 2014, Louis Perrott, Ph.D., a state agency psychologist, completed a PRTF in connection with the reconsideration of Gilliam's disability

claims. (R. at 62-63.) Perrott opined that Gilliam was mildly restricted in his activities of daily living, experienced moderate difficulties in maintaining social functioning and in maintaining concentration, persistence or pace and had experienced one or two episodes of decompensation of extended duration. (R. at 63.) Perrott also completed a mental residual functional capacity assessment of Gilliam, finding that he was moderately limited in his ability to carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to work in coordination with or in proximity to others without being distracted by them; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (R. at 67-69.) Perrott concluded that Gilliam would be able to meet the basic mental demands of competitive work on a sustained basis, but that he should have limited interactions with the general public. (R. at 69.)

Also on February 27, 2014, Dr. William Rutherford, Jr., M.D., another state agency physician, completed a physical residual functional capacity assessment of Gilliam in connection with the reconsideration of his disability claims. (R. at 65-67.) Dr. Rutherford opined that Gilliam could perform medium work with frequent balancing and stooping and occasional climbing of ramps and stairs, as well as ladders, ropes or scaffolds, kneeling, crouching and crawling. (R. at 65-66.) He found that Gilliam was limited in his ability for fine manipulation with the left hand and that he should avoid concentrated exposure to hazards, such as machinery and heights. (R. at 66-67.) Dr. Rutherford concluded that Gilliam's condition was

not severe enough to prevent him from working. (R. at 71.)

Gilliam saw B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist, on January 6, 2015, for a psychological evaluation at the request of his counsel. (R. at 799-808.) He was fully oriented, and he stated that he stopped using illicit substances several years earlier. (R. at 800, 802.) Lanthorn noted a previous diagnosis of bipolar disorder in 2007, and Gilliam stated that, although he had been seen at Frontier Health on several occasions, most recently in 2013, it did not help him much. (R. at 802.) His 2012 psychiatric hospitalization also was noted. (R. at 802.) Gilliam reported that he mostly stayed in his room throughout the day, stating that "I can't deal with people." (R. at 802.) He stated that he typically did not do his own laundry, but helped with the cooking, did some cleaning, watched television and read. (R. at 802.) He primarily socialized with his mother's friend with whom he resided, and he saw his sons when he could. (R. at 802.)

On mental status examination, Gilliam had clear and intelligible speech, but indicated that he had racing thoughts which often kept him awake. (R. at 803.) Despite complaints of not sleeping well, he advised Lanthorn that he fell asleep around 1:00 a.m. or 2:00 a.m. and did not get up until 9:00 a.m. or 10:00 a.m. (R. at 803.) His affect was somber, and he was "a bit dour" throughout the interview. (R. at 803.) He made erratic eye contact and showed signs of both anxiety and depression. (R. at 803.) Rapport was not "fully established," and Gilliam seemed uncomfortable, fidgety and on edge throughout the session. (R. at 803.) He denied hallucinations, but described himself as "paranoid." (R. at 803.) He rated his depression as a seven or eight on a 10-point scale, but he denied then-current suicidal or homicidal ideation, plans or intent. (R. at 803.) Gilliam described his short-term memory as "horrible" and his long-term memory, as well as concentration, as "adequate." (R. at 803.) He reported crying or feeling like crying

when alone, and he stated that he was nervous most of the time and had up to three panic attacks weekly, lasting up to 30 minutes each. (R. at 803.) He reported that these attacks were triggered by being in a crowd or away from home. (R. at 803-04.) After 10 minutes, Gilliam could recall three of five words, he correctly performed Serial 7 testing, he gave higher order and correct interpretations to three commonly used adages, and he correctly spelled "world" forwards and backwards. (R. at 804.) Gilliam displayed mild tremulousness at the beginning of the session, which increased to "near moderate" by the end. (R. at 804.)

Lanthorn administered the Wechsler Adult Intelligence Scale-Fourth Edition, ("WAIS-IV"), on which Gilliam achieved a full-scale IQ score of 70, placing him in the borderline range of intellectual functioning. (R. at 804.) Lanthorn also administered the Minnesota Multiphasic Personality Inventory – Second Edition, ("MMPI-2"), the results of which were deemed valid. (R. at 805-06.) This testing indicated that Gilliam was experiencing moderate or greater levels of emotional distress, that he was having difficulty concentrating on task, that he had marked and severe levels of ongoing depression and a tendency to be angry, belligerent and rebellious. (R. at 806.) Test results further indicated severe levels of anxiety and tension. (R. at 806.) Lanthorn opined that Gilliam may be experiencing serious psychopathology, and he diagnosed Gilliam with major depressive disorder, recurrent, severe; and panic disorder. (R. at 807.) Gilliam showed no signs of psychotic processes, and he was deemed competent to manage his own funds. (R. at 807.) Lanthorn opined that Gilliam should return to ongoing psychiatric and psychotherapeutic intervention as soon as he could afford it, as his psychopathology was "rather serious." (R. at 807.)

Lanthorn also completed a mental assessment of Gilliam, finding that he was

mildly[10] limited in his ability to understand, remember and carry out simple job instructions; moderately[11] limited in his ability to follow work rules and to maintain personal appearance; markedly[12] limited in his ability to relate to co-workers; to deal with work stresses; to function independently; to maintain attention and concentration; to understand, remember and carry out detailed, but not complex, job instructions; and to behave in an emotionally stable manner; and extremely[13] limited in his ability to deal with the public; to use judgment; to interact with supervisors; to understand, remember and carry out complex job instructions; to relate predictably in social situations; and to demonstrate reliability. (R. at 810-12.) Lanthorn stated he was basing these findings on his psychological evaluation of Gilliam, including a full-scale IQ score of 70. (R. at 810-12.) He opined that Gilliam could manage benefits in his own best interest and that he would miss more than two workdays monthly due to his impairments or treatment. (R. at 812.)

*III. Analysis*

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2016). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant

---

[10] A mild limitation is defined on this assessment as "… a slight limitation in this area, but the individual can generally function well." (R. at 810.)

[11] A moderate limitation is defined on this assessment as "… more than a slight limitation in this area but the individual is still able to function satisfactorily." (R. at 810.)

[12] A marked limitation is defined on this assessment as "… serious limitation in this area. There is a substantial loss in the ability to effectively function – resulting in unsatisfactory work performance." (R. at 810.)

[13] An extreme limitation is defined on this assessment as "… major limitation in this area. There is no useful ability to function in this area." (R. at 810.)

1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2016).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. The court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Gilliam argues that the ALJ erred by improperly determining his residual functional capacity. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-7.) In particular, Gilliam argues that the ALJ erred by rejecting the opinions of psychologist Lanthorn and by giving little weight to the opinions of Dr. Blackwell and the state agency physicians, instead coming to his own conclusions as to the severity of Gilliam's impairments, which he used as the basis for the residual functional capacity finding. (R. at 6-7.) Based on my review of the record, I find that the ALJ properly weighed the evidence in reaching his residual functional capacity finding and that this finding is supported by substantial evidence.

First, it is the sole responsibility of the ALJ to assess a claimant's residual functional capacity. *See* 20 C.F.R. §§ 404.1546, 416.946 (2016). The ALJ is not required to accept any one medical source's opinion, in its totality, as to a claimant's residual functional capacity. Instead, he must weigh the relevant evidence based on the factors set out in 20 C.F.R. §§ 404.1545, 416.945 (2016) and formulate an appropriate residual functional capacity based thereon. Thus, the undersigned finds Gilliam's argument unpersuasive, to the extent he is arguing that the ALJ erred by formulating his own residual functional capacity finding. Additionally, Gilliam argues that the ALJ erred by rejecting the opinions of psychologist Lanthorn that he suffered from "rather serious" psychopathology requiring a return to ongoing psychiatric and psychotherapeutic intervention, that he was seriously limited in his ability to make occupational, performance and personal/social adjustments and that Gilliam's impairments would cause him to miss more than two workdays monthly. For the following reasons, I also find this argument unpersuasive.

The ALJ found that Gilliam had the residual functional capacity to perform simple, easy-to-learn, unskilled light work that required no more than occasional operation of foot controls, no more than occasional balancing, kneeling, crouching, stooping/bending, climbing of ramps and stairs and interaction with supervisors, co-workers and the public, that did not require crawling or climbing of ladders, ropes or scaffolds, that did not require exposure to hazards or handling food or beverages and that provided a static work environment with few changes in work routines and settings. (R. at 23.) In reaching this finding, the ALJ assessed the evidence, including Gilliam's treatment record, diagnostic testing results and medical opinions. (R. at 24-27.) The ALJ gave Lanthorn's opinion "little weight" because it was contrary to the clinical findings and opinion rendered by the consultant psychologist and was inconsistent with treatment notes from Stone

Mountain showing a GAF score of 60 in September 2013, as well as the opinions rendered by the reviewing physician at the initial level and the reviewing psychologist at the reconsideration level. (R. at 27.) For the following reasons, I find that substantial evidence supports this weighing of the psychological evidence contained in the record.

Lanthorn opined that Gilliam was markedly limited in his ability to relate to co-workers; to deal with work stresses; to function independently; to maintain attention and concentration; to understand, remember and carry out detailed, but not complex, job instructions; and to behave in an emotionally stable manner; and extremely limited in his ability to deal with the public; to use judgment; to interact with supervisors; to understand, remember and carry out complex job instructions; to relate predictably in social situations; and to demonstrate reliability. Consultative psychological examiner Sims opined that Gilliam appeared to get along adequately with others; that he was moderately limited in his ability to understand and remember, but would be able to remember a work location and work schedule; and that he was moderately limited in his ability to sustain concentration and persistence and in his ability to interact with others; but that he was only mildly limited in his ability to adjust to change and its requirements, but would be able to travel unaccompanied to unfamiliar locations and be aware of normal hazards and take appropriate precautions.

Additionally, the treatment notes from Stone Mountain demonstrate that Gilliam suffered from a long history of drug abuse, which Gilliam was either mostly unwilling to treat or unwilling to treat in the manner suggested by the treatment providers. Over the time he treated with Stone Mountain, he displayed a mildly anxious and depressed mood, but he was consistently fully oriented with normal memory, judgment and insight. He denied hallucinations and suicidal and

homicidal ideations, for the most part, and he exhibited age-appropriate activities of daily living skills. He reported several personal stressors, including being unemployed, the deaths of his mother and grandmother, a separation and eventual divorce from his wife and losing custody of his young son to DSS due to his drug use. In April 2012, Gilliam had normal thought content, insight and judgment, and his intelligence was deemed average. His GAF score was assessed at 45, but he refused a referral for mental health counseling. Later that month, Gilliam was incarcerated after making threats to harm himself and others, and his wife advised that he had been injecting bath salts and using his mother's benzodiazepines. In May 2012, Gilliam requested Xanax after being incarcerated and having no medications for 43 days, and he remained unwilling to attend addiction treatment, but expressed his intent to find a doctor who would prescribe nerve medication. Nonetheless, he was fully oriented, had intact thought processes and was coherent and logical. In April, July and September 2013, Gilliam complained of anxiety, but denied depression, and he had no difficulty focusing, hyperactivity, moodiness, obsessive thoughts or compulsions. He had appropriate judgment and good insight with intact recent and remote memory. In September 2013, Gilliam had fair insight and judgment, proper orientation and intact recent and remote memory. He was described as "rude," leaving when he was denied a Xanax prescription. He stated that he maintained his anxiety by buying Xanax off the street. Later that month, he reported anxiety so bad, he did not want to leave the house, but he denied suicidal or homicidal ideations and hallucinations. Gilliam's GAF score was assessed at 60. In February 2014, Gilliam complained of extreme anxiety, but denied suicidal or homicidal ideations or psychosis. He reported that his disability claim was based on his Hepatitis C diagnosis, and he denied depression. However, he stated that he had not left his house in a couple of months. His GAF score was again assessed at 60.

I further find that Lanthorn's opinion is not supported by the other substantial evidence of record, including various treatment notes from the emergency departments at Mountain View and Norton Community. For instance, in August 2009, Gilliam was alert and oriented with appropriate behavior. In October 2010, he was calm with no homicidal or suicidal ideations. In June 2012, he denied anxiety, depression and memory problems, and he was fully oriented, alert, following commands and acting appropriately, with a normal mood and affect. In November 2012, Gilliam had a normal mental status. Finally, in August 2013, his mental status was described as being within normal limits. In addition to the emergency department notes, consultative examiner Dr. Blackwell's notes, from February 2013, indicate that Gilliam was alert and fully oriented with good mental status and intact thought content and general fund of knowledge. Finally, state agency examiners, Dr. Bockner and psychologist Perrott, opined that Gilliam was only mildly restricted in his activities of daily living, had moderate difficulties maintaining social functioning and maintaining concentration, persistence or pace and had experienced one or two episodes of decompensation of extended duration. They opined that he could perform the basic mental demands of competitive work, as long as he had limited interaction with the general public.

For all of these reasons, I find that substantial evidence supports the ALJ's weighing of the evidence and his resulting mental residual functional capacity finding.

Gilliam also argues that the ALJ erred by giving limited weight to Dr. Blackwell's and the state agency physicians' opinions in arriving at his physical residual functional capacity finding. Again, I disagree. Dr. Blackwell, in his February 2013 consultative examination of Gilliam, opined that he was limited to standing for two hours in an eight-hour workday based on chronic bilateral knee

pain. The ALJ gave limited weight to this opinion, however, as it was inconsistent with the "rather benign" clinical findings Dr. Blackwell recorded. (R. at 26.) For instance, in Dr. Blackwell's report, he noted that Gilliam's physical examination was normal, including a symmetrical and balanced gait, good and equal bilateral shoulder and iliac crest heights, no effusions or obvious deformities of the upper or lower joints, normal size, shape symmetry and strength in all extremities, full and equal grip strength bilaterally, normal fine motor movement and skill activities of the hands, good and equal reflexes in all extremities, negative Romberg test and intact proprioception. Dr. Blackwell further found that Gilliam's range of motion in all areas tested, including the knees, was within normal limits. I also find that such a limitation on Gilliam's ability to stand is not supported by the other substantial evidence of record. For instance, in June 2012, Gilliam complained of lower extremity swelling, pain and cellulitis, but a bilateral venous duplex ultrasound of the lower legs showed no evidence of deep vein thrombosis. In July 2012, Gilliam had no physical complaints and exhibited a normal gait and station and full range of motion with full and equal strength bilaterally. Mild edema of the feet was noted and attributed to Gilliam's Hepatitis C. In November 2012, Gilliam complained of right knee pain with bending, and he was referred to an orthopaedist. However, there is no indication that he ever attended an orthopaedic appointment. Also in November 2012, Gilliam complained of left knee pain after a dirt bike accident, but he was only advised to take over-the-counter ibuprofen. In January 2013, Gilliam told Sims he could not work, partly because his knees were "shot." He reported muscle loss and weakness, but he was taking no medications. Nonetheless, he stated he was able to mow the yard. Later that month, x-rays of Gilliam's knees showed no abnormality except for a likely nonossifying fibroma or fibrous cortical defect. In April, May and July 2013, Gilliam had a normal gait, and in August 2013, he had a full range of motion in all extremities.

For all of these reasons, I find that substantial evidence supports the ALJ's decision to give limited weight to Dr. Blackwell's opinion as to Gilliam's standing limitations.

The ALJ also gave little weight to the opinions of the state agency physicians because, he stated, their opinions that Gilliam could perform work at the medium level of exertion was not supported by the overall record. (R. at 26.) That being the case, the ALJ's residual functional capacity finding was actually more restrictive than that imposed by the state agency physicians. Thus, according more weight to these opinions would not have resulted in a finding that Gilliam was disabled. For this reason, I find any such argument by Gilliam unpersuasive.

For all of the above-stated reasons, I find substantial evidence exists to support the ALJ's weighing of the evidence and resulting residual functional capacity finding that Gilliam could perform a limited range of light work. I further find that substantial evidence exists to support the ALJ's finding that Gilliam was not disabled and not entitled to benefits. An appropriate Judgment and Order will be entered affirming such finding.

DATED:    May 1, 2017.

_s/ Pamela Meade Sargent_
UNITED STATES MAGISTRATE JUDGE